UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X
:
UNITED STATES OF AMERICA,                          :
:
                                    Plaintiff,     :        13 Civ. 7983 (KPF)
:
                    v.                             :        OPINION AND ORDER
:
ANY AND ALL FUNDS ON DEPOSIT IN                    :
ACCOUNT NUMBER 0139874788, AT                      :
REGIONS BANK, HELD IN THE NAME OF                  :
EFANS TRADING CORPORATION, *et al.*,               :
:
                    Defendants-in-rem. :
:
------------------------------------------------------X

KATHERINE POLK FAILLA, District Judge:

On November 8, 2013, the United States of America (the "Government")

filed a verified complaint seeking civil forfeiture of certain assets — here, 48

cars and funds contained in four bank accounts — allegedly derived from

illegal activities.  Claims over these seized assets (the "Defendants-in-rem")

have been filed by Unicorn Tire Corporation ("Unicorn") and Efans Trading

Corporation ("Efans") (collectively, "Claimants").  Claimants argue that the

Government is unable to establish a violation of export laws; that it has failed

adequately to plead its mail and wire fraud claims; that it has failed to

establish *in rem* jurisdiction over 36 of the 48 cars seized outside the Southern

District of New York; and that it has failed to plead how funds from one of the

four bank accounts at issue facilitated the allegedly unlawful activities.

Separately, Claimants seek a hearing to determine whether the Government

had probable cause to seize the assets.  For the reasons stated in this Opinion, Claimants' motions are denied in their entirety.

**BACKGROUND**[1]

## A.    The Alleged Scheme

The cornerstone of the Government's allegations regarding a fraudulent scheme lies in its assertion that "[a] high-end exotic vehicle … will often net double or triple its value overseas."  (Am. Compl. ¶ 19).  There exists, in consequence, an arbitrage opportunity for vehicle brokers — individuals who purchase cars in the United States for immediate export to other countries.  (*See id.*).

In an attempt to prevent such activity, automobile manufacturers have contracted with dealerships to require that new automobiles made for sale within the United States not be sold to individuals or companies intending to export the new automobiles outside the United States.  (Am. Compl. ¶ 9).  Automobile manufacturers impose this prohibition because, it is alleged,

---

[1]    The facts contained in this Opinion are drawn from the Amended Complaint ("Am. Compl.") (Dkt. #21), and are taken as true for purposes of the pending motion.  *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (when reviewing a complaint for failure to state a claim, the court will "assume all well-pleaded factual allegations to be true" (internal quotation marks omitted)); *accord In re 650 Fifth Ave. & Related Properties*, 777 F. Supp. 2d 529, 541-42 (S.D.N.Y. 2011) (applying this standard in the context of a claimant's motion to dismiss a civil forfeiture complaint).

Two sets of briefs have been filed by the parties in this action: one set of briefs related to the motion to dismiss, and one set of briefs related to the motion for a probable cause hearing.  For convenience, the parties' briefs for the first motion are referred to as "Clmt. Br." (Dkt. #23), "Gov't Opp." (Dkt. #29), and "Clmt. Reply" (Dkt. #30); and the parties' briefs for the second motion are referred to as "Clmt. Hrg. Br." (Dkt. #32), "Gov't Hrg. Opp." (Dkt. #34), and "Clmt. Hrg. Reply" (Dkt. #35).

unauthorized exports of their new automobiles cause "numerous financial problems ... including, among other things, by creating problems in the manufacturers' distribution markets, causing market infringement problems, harming franchise dealerships, and causing problems relating to vehicle recall registration and service." (*Id.* at ¶ 10). The contractual agreements between the manufacturers and dealerships often carry monetary penalties, commonly called "charge backs," which the manufacturers may assess against dealerships if the manufacturers determine that dealerships are selling new automobiles to purchasers who intend to export them rather than use them in the United States. (*Id.* at ¶ 11).

Such contractual arrangements do not stop vehicle brokers from attempting to purchase automobiles from dealerships by concealing the fact that the vehicle is intended for immediate export. (Am. Compl. ¶ 15). Vehicle brokers have difficulty purchasing the vehicles directly, however, because manufacturers maintain and distribute to the dealerships so-called "Auto-Exporter" lists. (*Id.* at ¶ 13). Dealers are prohibited from selling a vehicle to an individual or company on the list. (*Id.*). As a result, vehicle brokers may utilize a "straw buyer" — an individual who is recruited to consummate the transaction, and who receives a small amount of compensation for his or her cooperation — to make the purchase from the dealer. (*Id.* at ¶ 15). The straw buyer purchases the vehicle, without test driving it or negotiating a price, and then immediately turns it over to the broker who recruited him or her to make

the purchase. (*Id.*). There is as well an issue of insurance: Because an uninsured vehicle will not be permitted to leave the dealership, the straw buyer or the broker must obtain an insurance policy in order to get the vehicle off of the lot. (*Id.* at ¶ 17). The insurance policy is then typically cancelled before any payments are made on it. (*Id.*).

According to the Amended Complaint, the buyers and brokers make false statements to automobile dealerships and insurance companies concerning the buyer's intended use of the vehicle. (Am. Compl. ¶¶ 16-17). In some cases, the buyer signs a form representing to the dealership that the vehicle will not be exported out of the United States for a period of at least 12 months. (*Id.* at ¶ 16). Similarly, in some cases, the insurance company is told that the vehicle will be garaged at the home of the straw buyer, and not immediately handed over to the broker for export. (*Id.* at ¶ 17).

Additionally, the Government alleges that the brokers authorize Shipper's Export Declarations ("SEDs"), which are shipping forms required by U.S. Customs and Border Protection ("CBP"), to be completed for the vehicles in a manner that furthers the scheme. (*Id.* at ¶ 18). Specifically, the Government alleges that the brokers cause the Vehicle Identification Numbers ("VINs") to be omitted from the SEDs so that the manufacturers remain unaware that the automobile has been exported. (*Id.* at ¶¶ 33-36).

The Government alleges that "[m]anufacturers, dealerships, and insurance companies … stand to suffer, and have suffered, significant harm

4

from the scheme, which has caused a discrepancy between the benefits they reasonably anticipate from the transactions and the actual benefits they receive." (Am. Compl. ¶ 20). More specifically, the Government alleges that manufacturers have spent hundreds of millions of dollars to repair cars in other countries that were specifically designed to operate on octane fuel available in North America; that dealerships have been assessed monetary penalties by the manufacturers for selling cars that have been exported pursuant to the scheme; and, finally, that insurance companies have expended unnecessary employee hours and incurred other costs in creating and issuing insurance policies that were obtained under false pretenses and cancelled almost immediately. (*Id.* at ¶ 20(a)-(c)).

## B.    Claimants' Role in the Alleged Scheme

The Government alleges that Efans is one of the vehicle brokers that has engaged in this activity. (*See* Am. Compl. ¶¶ 21-24, 41-42). Efans, which is located in Memphis, Tennessee, shares a building with Unicorn Tire; the two companies are owned by the same two individuals (referred to in the Amended Complaint as "Owner-1" and "Owner-2"). (*Id.* at ¶ 22).

Efans and Unicorn Tire each maintains a business checking account at the Regions Bank branch in Cordova, Tennessee (the "Efans Regions Account" and the "Unicorn Regions Account," respectively), funds from which are Defendants-in-rem. (Am. Compl. ¶ 25). The Government alleges that each month, Owner-1 and Owner-2, who jointly control both accounts, use the

5

Unicorn Regions Account to transfer money to the Efans Regions Account; the Unicorn Regions Account then "zeroes out" at the beginning and end of each month, so that Owner-1 and Owner-2 can use the Efans Regions Account to purchase luxury vehicles for export pursuant to the scheme.  (*Id.* at ¶¶ 26, 29).  Further, Owner-1 and Owner-2 transfer proceeds from the sales of the vehicles back from the Efans Regions Account to the Unicorn Regions Account.  (*Id.* at ¶ 29).

Efans and Unicorn Tire also each maintains a business checking account at the Renasant Bank branch in Germantown, Tennessee (the "Efans Renasant Account" and the "Unicorn Renasant Account," respectively); funds from the Unicorn Renasant Account (but not the Efans Renasant Account) are Defendants-in-rem.  (Am. Compl. ¶ 30).  The Government alleges that Owner-1 and Owner-2, who control both of these accounts, transfer money from the Unicorn Renasant Account to the Unicorn Regions Account, which allows Owner-1 and Owner-2 to use the Unicorn Regions Account to fund the purchase of the luxury vehicles from the Efans Regions Account.  (*Id.* at ¶¶ 30-31).

Homeland Security Investigations ("HSI"), which has investigated Efans's export activity, identified a group of instances in which Efans was able to purchase vehicles and export them from the country.  (Am. Compl. ¶ 33).  According to the Amended Complaint, HSI identified a pattern of Efans purchasing vehicles through the use of straw buyers, who paid for the vehicles

in full on the date of the sale, using cashier's checks drawn on the Efans Regions Account.  (*Id.* at ¶ 37).  Additionally, the Government alleges that, through interviews of some of Efans's straw buyers, HSI identified false statements made to dealerships and insurance companies regarding the straw buyers' intended use of these vehicles.  (*Id.* at ¶ 38).  Specifically, dealerships were told that the cars would not be exported for at least 12 months, and insurance companies were told that the straw buyers intended to drive the cars and to garage the cars at their homes.  (*Id.* at ¶¶ 38-39).  The Government alleges that these representations were false, and that the automobiles were purchased for immediate export.  (*See id.*).  It further alleges that Efans authorized the omission of the VINs from the SEDs for vehicles that it exported, which effectively concealed the vehicles' export from the manufacturers.  (*Id.* at ¶¶ 35-36).

**C.    The Seizures of the Defendants-in-rem**

**1.    The Bank Accounts**

On October 7, 2013, the Honorable Gabriel W. Gorenstein, United States Magistrate Judge, issued seizure warrants (the "October 7 Seizure Warrants") for the Efans Regions Account and the Unicorn Regions Account.  (Am. Compl. ¶ 43).[2]  Pursuant to the October 7 Seizure Warrants, the Government seized

---

[2]     The Government also seized a bank account held in the name of MND Enterprises Inc. (Am. Compl. ¶¶ 43, 56).  According to the Government, no one has claimed these funds. (Gov't Opp. 6).

approximately $489,316 from the Efans Region Account and approximately $695,749.49 from the Unicorn Regions Account.  (*Id.*).

The October 7 Seizure Warrants included so-called "damming" language that directed Regions Bank to disallow any debits or withdrawals from the Efans Regions Account and the Unicorn Regions Account during the time period between October 8, 2013, and October 21, 2013.  (Am. Compl. ¶ 44). Nevertheless, on or about October 15, 2013, a check in the amount of $567,000 was returned to the Unicorn Renasant Account from the Unicorn Regions Account.  (*Id.*).  Regions Bank subsequently informed the Government that the check had been sent back to the Unicorn Renasant Account for insufficient funds.  (*Id.*).  On or about October 18, 2013, the Government issued a freeze letter for the Unicorn Renasant Account, on the grounds that there was probable cause to believe that its contents were subject to seizure and forfeiture, and on the same date learned that the balance in the Unicorn Renasant Account exceeded $2,000,000.  (*Id.*).

On November 6, 2013, the Honorable Ronald L. Ellis, United States Magistrate Judge, issued a seizure warrant for the Unicorn Renasant Account, finding probable cause to believe that this account was subject to seizure and forfeiture under Title 19, United States Code, Section 1595a(d).  (Am. Compl. ¶ 44).  Pursuant to this seizure warrant, the Government seized approximately $2,320,865.03 from the Unicorn Renasant Account.  (*Id.*).

## 2.  The Automobiles

The Government also seized automobiles that Efans (through straw purchasers) purchased for export.  HSI reviewed SEDs listing the contents of containers at the Port of New York and New Jersey (the "Port") to locate any vehicles belonging to Efans that were scheduled to be shipped overseas.  (Am. Compl. ¶ 45).  HSI identified containers at the Port holding 12 vehicles, and containers on the water holding 28 vehicles that were in the process of being shipped overseas by Efans (the "Twelve Vehicles" and the "Twenty-Eight Vehicles," respectively).  CBP placed shipping holds on these containers.  (*Id.* at ¶ 46).  On November 6, 2013, Magistrate Judge Ellis issued seizure warrants for the Twelve Vehicles, which were still located at the Port.  (*Id.*).  After the Twenty-Eight Vehicles left the Port, but before they had reached their destination overseas, CBP ordered that the vehicles be re-delivered to the Port for an export examination.  (*Id.* at ¶ 47).

On October 24, 2013, the Government interviewed the employee of a freight forwarder who worked with Efans to ship automobiles.  (Am. Compl. ¶ 49).  The employee informed the Government that Efans had planned to ship eight additional cars (the "Eight Vehicles") from the Port, but had recently caused the cars to be moved to a location in Newark, New Jersey.  (*Id.*).  Investigators interviewed employees of a Newark-based freight forwarder — who confirmed that Efans had been planning to ship the vehicles overseas — and located the Eight Vehicles.  (*Id.*).  The Government seized the Eight Vehicles on

the grounds that there was probable cause to believe that the vehicles, which were purchased by Efans for immediate export in the same manner as the Twelve Vehicles and the Twenty-Eight Vehicles, were subject to forfeiture.  (*Id.*).

Following the seizure, the Eight Vehicles were processed by HSI at a location within the Southern District of New York.  They are currently being stored, in HSI's custody, at a location in New Jersey.  (*Id.*).

## D.    The Instant Litigation[3]

On November 8, 2013, the Government initiated the instant forfeiture action by filing a Verified Complaint against the Efans Regions Account, the Unicorn Regions Account, the Unicorn Renasant Account, and 47 vehicles that Efans attempted to export as part of the alleged scheme.  (Dkt. #1).  The Government alleged that Claimants committed mail and wire fraud, in violation of 18 U.S.C. §§ 1341, 1343, and 1349; and used SEDs to further their illegal activity, in violation of 13 U.S.C. § 305(a)(2).

Claimants filed their claims to the Defendants-in-rem on December 11, 2013, and, on December 12, 2013, requested a pre-motion conference to

---

[3]     Claimants in this action attempted to challenge the seizure of property prior to the filing of the Verified Complaint.  On October 29, 2013, Unicorn Tire filed an Emergency Complaint and Petition for Release of Seized Property Pursuant to Fed. R. Crim. P. 41(g).  The case was assigned to the Honorable Alvin K. Hellerstein, United States District Judge for the Southern District of New York.  Unicorn Tire's action was dismissed by Judge Hellerstein on November 13, 2013, as moot because the instant action afforded Unicorn Tire with a civil remedy to contest the seizure.  *See Unicorn Tire Corp.* v. *United States*, No. 13 Civ. 7636, Dkt. #17 (AKH) (S.D.N.Y. Nov. 13, 2013) ("The pending civil forfeiture proceedings provide an adequate remedy at law and thereby justifies dismissal of the Rule 41(g) motion.  Petitioner has access to a civil remedy to contest ownership of the property and lawfulness of the seizure and I therefore decline to exercise equitable discretion to retain jurisdiction over the matter." (internal quotation marks and citations omitted)).

discuss their anticipated motion to dismiss.  (*See* Dkt. #4-6).  On January 16, 2014, the Court held a pre-motion conference and set a briefing schedule for Claimants' motion to dismiss.  (Dkt. # 19).  Claimants filed their motion to dismiss on February 3, 2014 (Dkt. #15), and on February 24, 2014 — 21 days after Claimants filed their motion — the Government filed its Amended Complaint (Dkt. #21), which added a vehicle as a Defendant-In-Rem and made additional factual allegations.  (*See, e.g.*, Am. Compl. ¶¶ 20, 35, 36, 39, 40, 47).[4]  On March 3, 2014, Claimants filed their motion to dismiss the Amended Complaint (Dkt. #22); on March 17, 2014, the Government filed its opposition brief (Dkt. #29); and on March 27, 2014, the motion was fully briefed upon the filing of Claimants' reply brief (Dkt. #30).

Additionally, on April 9, 2014, Claimants filed a Motion to Unseal Affidavits of Probable Cause, Request for a Probable Cause Hearing and Demand for the Immediate Release and Return of Seized Property.  (Dkt. #31).[5]

---

[4]   As the Government readily admits, some of the changes were made to address arguments advanced in Claimants' pre-motion conference letter, raised by the Court during the pre-motion conference, and raised in Claimants' motion to dismiss.  (*See* Gov't Opp. 6 n.1).  This amendment was made as a matter of course and was timely. Fed. R. Civ. P. 15(a)(1)(B) (permitting amendments made 21 days after service of a motion to dismiss under Fed. R. Civ. P. 12(b)).  The Court does not accept Claimants' assertion that this amendment bespeaks "a lack of good faith on the part of the Government."  (Clmt. Br. 1).  The Government expressed a desire to amend the complaint during the pre-motion conference, noting, for example, that the Complaint "may … need[] to be amended to list [the Twenty-Eight Vehicles] out in specificity." (Dkt. #19 at 8).

[5]   Although Claimants have captioned their motion to include the "Demand for the Immediate Release and Return of Seized Property," they do not address this issue in their brief.  (*See, e.g.*, Clmt. Hrg. Br. 26).  Therefore, the Court interprets this motion as only a motion for probable cause hearing and a motion to unseal affidavits, the latter of which has been rendered moot by the Court's Order of June 5, 2014, ordering the affidavits to be unsealed.  (*See* Dkt. #34, 37).

The Government filed its opposition on April 23, 2014.  (Dkt. #34).  Claimants submitted a reply on April 30, 2014, at which time the motion was fully briefed.  (Dkt. #35).  The Court will now address the pending motions.

## DISCUSSION

### A.    Applicable Law

"Motions to dismiss *in rem* forfeiture actions are governed by Federal Rule of Civil Procedure 12(b) and Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions."  *In re 650 Fifth Ave.*, 777 F. Supp. 2d at 541; *see also* Fed. R. Civ. P. 12(b); Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions (the "Supplemental Rules" or "Supp. R.").  When considering such a motion, the Court must "draw all reasonable inferences in Plaintiff's favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief."  *Faber*, 648 F.3d at 104 (internal quotation marks omitted) (quoting *Selevan* v. *N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009)).  A plaintiff will survive a motion to dismiss if he alleges "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 569 (2007); *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) ("[W]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to

12

nudge [plaintiff's] claims across the line from conceivable to plausible." (internal quotation marks omitted)).

Under Supplemental Rule G(2)(f), a complaint must "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial." *United States* v. *$32,507.00 in U.S. Currency*, No. 14 Civ. 5118 (CM), 2014 WL 4626005, at *1 (S.D.N.Y. Sept. 16, 2014); *accord United States* v. *Real Prop. Known as Unit 5B of Onyx Chelsea Condo.*, No. 10 Civ. 5390 (KBF), 2012 WL 1883371, at *6 (S.D.N.Y. May 21, 2012). Accordingly, the Government's complaint must "assert specific facts supporting an inference that the property is subject to forfeiture." *United States* v. *$22,173.00 in U.S. Currency*, 716 F. Supp. 2d 245, 248 (S.D.N.Y. 2010) (citation omitted).

For those forfeiture actions proceeding under 19 U.S.C. § 1595a, such as this, "the burden of proof set forth in 19 U.S.C. § 1615 applies." *United States* v. *Davis*, 648 F.3d 84, 96 (2d Cir. 2011).[6] "[T]he initial burden rests on the government to demonstrate probable cause that the merchandise is subject to forfeiture.  The burden of persuasion then shifts to the claimant to show, by a preponderance of the evidence, that the merchandise is not subject to forfeiture." *United States* v. *Broadening-Info Enters., Inc.*, 578 F. App'x 10, 17 (2d Cir. 2014) (summary order) (internal citations omitted).  The interplay

---

[6]     "[T]he burden of proof shall lie upon [the] claimant ... *Provided,* That probable cause shall be first shown for the institution of such suit or action, to be judged of by the court[.]"  19 U.S.C. § 1615 (emphasis in original).

between Supplemental Rule G and 19 U.S.C. § 1615 requires the Government to plead sufficiently detailed facts to support a reasonable belief that it will be able to establish, at trial, probable cause that the property is subject to forfeiture.  *See* 19 U.S.C. § 1615; Supp. R. G(2)(f).

**B.    Analysis**

    **1.    Defendants' Motion to Dismiss Is Denied**

        **a.    The Amended Complaint Adequately Pleads Export Activities "Contrary to Law"**

The forfeiture provision relied upon by the Government in this case provides that

> Merchandise exported or sent from the United States or attempted to be exported or sent from the United States *contrary to law*, or the proceeds or value thereof, and property used to facilitate the exporting or sending of such merchandise, the attempted exporting or sending of such merchandise, or the receipt, purchase, transportation, concealment, or sale of such merchandise prior to exportation shall be seized and forfeited to the United States.

19 U.S.C. § 1595a(d) (emphasis added).  Claimants argue that the Government must, but cannot, establish a violation "contrary to" U.S. Customs law in order to survive a motion to dismiss.  (*See* Clmt. Br. 10-12).  From this, they argue that the Government's mail and wire fraud allegations fail to establish such a violation because they constitute ordinary criminal offenses, and not customs-related violations.  (*See id.*).  Separately, with respect to the allegations concerning the filing of SEDs in violation of 13 U.S.C. § 305(a)(2) — which is indisputably a customs-related law — Claimants argue that the Amended

14

Complaint fails to state a claim.  (*Id.* at 12-13).  The Government counters that violations of Title 18, such as mail and wire fraud violations, may be used to establish forfeitability under § 1595a(d) and that, in any event, the Amended Complaint states a claim for a violation of customs-related law based on the omission of VINs from the SEDs.  (Gov't Opp. 10-16).

The Second Circuit's decision in *Davis* is both instructive and corroborative of the Government's arguments.  There, the Government seized property that was transported into the United States in violation of the National Stolen Property Act ("NSPA"), 18 U.S.C. §§ 2314, 2315.  648 F.3d at 89.  The Court noted

> a strong argument that the phrase "contrary to law" in Section 1595a[] means exactly what it says: the government may seize and forfeit merchandise that is introduced into the United States illegally, unlawfully, or in a manner conflicting with established law, *regardless of whether the law violated relates to customs enforcement.*

*Id.* at 90 (emphasis added).  At the same time, the Second Circuit acknowledged as viable the argument, based largely on legislative history, "that *some nexus* between international commerce — the subject of the customs regulations found in Title 19 — and the law violated is necessary to trigger Section 1595a's remedies."  *Id.* (emphasis added).  Ultimately, the Court did not reach the issue of whether the Government could fulfill the requirement of § 1595a by alleging a violation of *any* law, instead finding that "even if such a nexus is required, the NSPA provides one."  *Id.*

15

Thus, although the precise meaning of "contrary to law" remains unsettled, *Davis* provides this Court with substantial guidance. That said, the Court disagrees with certain of the parties' arguments regarding *Davis*. Claimants' gloss on *Davis*, for instance, would have the Court ask whether the violation alleged is the "functional equivalent of a Title 19 customs statute" (Clmt. Reply 2); that is simply not a fair reading of *Davis*. Instead, at most the question this Court must answer is whether "some nexus between international commerce ... and the law violated" exists. *Davis*, 648 F.3d at 90. To be sure, this is a relatively low threshold — and one that likely reflects the Second Circuit's observation that the Government has a strong argument that § 1595a applies "regardless of whether the law violated relates to customs enforcement." *Id.* In any event, as in *Davis*, the Government's Amended Complaint meets § 1595a's requirement of an export "contrary to law" because there is a nexus between the claims and international commerce.

The Government has alleged that "Efans caused mails and wires to be used in the execution of this fraudulent scheme, by, *inter alia*, causing titles for the vehicles to be delivered to straw purchasers through the mail, and receiving foreign wire transfers from China in payment for the vehicles." (Am. Compl. ¶ 41). In other words, the very acts alleged to be violations of the mail and wire fraud statutes have a close relationship to international commerce. The export of vehicles to foreign countries bears more than "some nexus" to international commerce: It *is* international commerce. And there is — as in *Davis* — some

16

nexus between "the law violated" and international commerce.  *See* 18 U.S.C.

§ 1343 (requiring that a wire be sent "in interstate or foreign commerce").

Accordingly, the Government's mail and wire fraud allegations are sufficient to

establish an export "contrary to law" as required by § 1595a.

Additionally, the Court finds that the Government has sufficiently alleged

a violation of a customs-related law, namely, that Claimants used SEDs to

further their illegal scheme in violation of 13 U.S.C. § 305(a)(2).  Claimants

contend that the Government has failed to state a claim for a violation of this

statute, but the pleadings belie that argument.  Section 305(a)(2) requires a

showing that a person (i) "use[d] [an] SED" (ii) "to further any illegal activity."

13 U.S.C. § 305(a)(2).  The Government has alleged that Claimants used SEDs

in connection with their exports, and specifically that they omitted certain VINs

so that manufacturers would not discover the alleged export scheme.  Because

the Government alleges these omissions were done to "further ... illegal

activity," consisting of the alleged mail and wire fraud scheme, it has

sufficiently pleaded this violation.[7]

---

[7]   This is not to say that Claimants' arguments regarding the role SEDs played in the export process for these vehicles, and the possible ramifications of omitting VINs, lack merit.  (*See* Clmt. Br. 13-18).  However, "a ruling on a motion for dismissal pursuant to Rule 12(b)(6) is not an occasion for the court to make findings of fact."  *Roth* v. *Jennings*, 489 F.3d 499, 509 (2d Cir. 2007).  Whether and to what extent manufacturers or the Government generally have access to SEDs, to the VINs contained therein, or to the specific VINs of the vehicles at issue here, are questions of fact that cannot be resolved by the Court at the motion to dismiss stage.  *See United States* v. *Various Vehicles*, No. 13 Civ. 2444 (CMC), 2014 WL 6604057, at *4 (D.S.C. Nov. 20, 2014) ("Taken in the light most favorable to the Government, the Complaint also adequately alleges violation of [13 U.S.C. § 305].").

### b.    The Amended Complaint Adequately Pleads Mail and Wire Fraud

Claimants next argue that the Government's mail and wire fraud allegations are inadequate because they fail to establish (i) "illicit conduct"; (ii) "actual fraud"; (iii) "a "convergence" of the deceived and the injured; and (iv) a loss to "money or property." (Clmt. Br. 20-24). They also argue that the Government's allegations regarding fraudulent statements made in connection with the straw buyers' insurance applications are legally insufficient. (*Id.* at 25-26). Taking the allegations in the Complaint as true — as the Court must at this stage — the Court finds that the Government has adequately pleaded its mail and wire fraud claims.[8]

The "essential elements of a mail or wire fraud violation are [i] a scheme to defraud, [ii] money or property as the object of the scheme, and [iii] use of the mails or wires to further the scheme." *United States* v. *Shellef*, 507 F.3d 82, 107 (2d Cir. 2007) (internal quotation marks omitted). To establish a

---

[8]    In this regard, Claimants argue that the particularity requirements of Fed. R. Civ. P. 9(b) apply to this action. (*See* Clmt. Br. 9-10, 18, 25). But "courts have rejected the application of Fed. R. Civ. P. 9(b)'s heightened pleading requirement to civil *in rem* forfeiture cases." *United States* v. *All Funds on Deposit in Dime Sav. Bank of Williamsburg*, 255 F. Supp. 2d 56, 68 n.19 (E.D.N.Y. 2003); *accord United States* v. *Approximately $25,829,681.80 in Funds*, No. 98 Civ. 2682 (LMM), 1999 WL 1080370, at *7 (S.D.N.Y. Nov. 30, 1999) ("This Court has found no precedent for applying Rule 9(b) to a forfeiture action involving defendant-in-rem property[.] As long as the Government alleges specific facts supporting an inference that the funds are traceable to the wire fraud and mail fraud, it has met its burden at this stage of the proceedings."), *aff'd*, 56 F. App'x 40 (2d Cir. 2003) (summary order); *United States* v. *$15,270,885.69 on Deposit*, No. 99 Civ. 10255 (RCC), 2000 WL 1234593, at *6 (S.D.N.Y. Aug. 31, 2000) ("The Court agrees, finding Rule 9(b) inapplicable to civil [*in rem*] actions because the particularity requirements applicable in this context are guided by [the Supplemental Rules] in combination with the comparatively low, probable cause standard[.]"). As discussed *supra*, the pleading requirements of Supplemental Rule G apply to the instant action.

scheme to defraud, the Government must present proof that defendants possessed a fraudulent intent. *United States* v. *Starr*, 816 F.2d 94, 98 (2d Cir. 1987). However, "[i]t need not be shown that the intended victim of the fraud was actually harmed; it is enough to show defendants contemplated doing actual harm, that is, something more than merely deceiving the victim." *United States* v. *Schwartz*, 924 F.2d 410, 420 (2d Cir. 1991); *accord United States* v. *Novak*, 443 F.3d 150, 156 (2d Cir. 2006).

As an initial matter, the Court rejects Claimants' argument that the Government has failed to plead "illicit conduct." Claimants contend that "[t]he Amended Complaint fails to establish that the purchase and export of luxury automobiles from the United States to foreign jurisdictions is anything other than lawful business enterprise that takes advantage of a natural arbitrage opportunity created by a manufacturer-set disparity between domestic and foreign car prices." (Clmt. Br. 19). The appropriate question for this Court to address is not whether the Government has established that Claimants' business model of purchasing and exporting luxury automobiles was illegal; rather, it is whether, taking all allegations in the Amended Complaint as true, the Government has shown that Claimants' activity constitutes a "scheme to defraud."[9] Upon a careful review of the allegations in the Amended Complaint, the Court answers this question in the affirmative.

---

[9]    Claimants assert that the "Government's theory of forfeiture is both controversial and untested." (Clmt. Br. 19). In support, Claimants cite *United States* v. *Wells Fargo Bank Account*, No. 13 Civ. 716 (SSB) (S.D. Ohio Feb. 4, 2014), an unpublished Order from the

First, the Government has satisfied the requirement of showing "actual fraud" because it has alleged an intent to defraud — rather than a mere intent to deceive. "[F]raud in the bargaining may be inferable from facts indicating a discrepancy between benefits reasonably anticipated because of the misleading representations and the actual benefits which the defendant delivered[.]" *United States* v. *Regent Office Supply Co.*, 421 F.2d 1174, 1182 (2d Cir. 1970). In this case, the Government has alleged that three separate groups were denied benefits they reasonably anticipated to receive as a result of various transactions alleged to be integral to the scheme: (i) the manufacturers who anticipated that they would not have to incur costs to repair vehicles that they

---

United States District Court for the Southern District of Ohio, in which the court expressed concern that allegations offered by the Government, which were similar to those alleged here, failed to sufficiently demonstrate unlawful conduct. *Id.* at 9-10. However, the district court in *Wells Fargo* reached this conclusion after an evidentiary hearing had occurred. *See id.* at 10. It is therefore inapposite, in that the court was not confined to the four corners of the forfeiture complaint. *See id.* at 9 ("In the Court's view, [claimant's] arguments, evidence and its offer of proof concerning [the agent's] declaration, raise a significant question whether the Government has shown probable cause to continue to hold these assets at this juncture of the case."); *id.* at 10 ("Based on the record developed to date, [claimant] has established a reasonable dispute about the government's probable cause showing."). Moreover, although Claimants assert this particular forfeiture theory is controversial, it is not wholly "untested." Following the briefing on the instant motions, at least one federal district court, in the District of South Carolina, has denied motions to dismiss similar forfeiture complaints. *See United States* v. *$795,652.33 in Funds*, No. 13 Civ. 2624 (CMC), 2014 WL 6749118, at *3 (D.S.C. Dec. 1, 2014) ("[T]he Complaint outlines a specific scheme to defraud dealerships and manufacturers, both of whom have property interests in the vehicles in question. By the use of 'straw purchasers,' material information was concealed from the dealerships and manufacturers relating to the identity of the 'true' purchaser and the purchaser's export intentions. These material misrepresentations certainly deprived the dealerships and manufacturers of property and injured the victims via sale of vehicles which otherwise may not have occurred."); *Various Vehicles*, 2014 WL 6604057, at *3 (same); *cf. United States* v. *$52,037.96 Held in the Name of Sand Int'l*, No. 14 Civ. 591 (WWE), 2014 WL 7399377, at *4 (D. Conn. Dec. 30, 2014) (dismissing complaint, premised on a similar forfeiture theory, with leave to replead where Government failed to allege that purchaser made misrepresentations of fact to dealer).

never intended would be exported to foreign markets (*see* Am. Compl. ¶ 20(a));
(ii) the dealers who anticipated that they would not be subject to penalties for
selling vehicles that were exported (*see id.* at ¶ 20(b)); and (iii) the insurance
companies that anticipated that policies would not be cancelled almost
immediately after incurring costs associated with issuing the policies (*see id.* at
¶ 20(c)).

The Second Circuit has "drawn a fine line between schemes that do no
more than cause their victims to enter into transactions they would otherwise
avoid — which do not violate the mail or wire fraud statutes — and schemes
that depend for their completion on a misrepresentation of *an essential element
of the bargain* — which do violate the mail and wire fraud statutes." *Shellef*,
507 F.3d at 108 (emphasis added).  In *Schwartz*, the Second Circuit affirmed a
conviction for wire fraud where defendant exported night vision goggles out of
the country to particular "restricted nations," after promising the dealer of
those goods that he would not do so.  924 F.2d at 421.  The dealer asserted
that it would not have contracted with the defendant if not for the explicit
assurance.  *Id.* at 420.  Because the promise not to export to particular
countries went "to an essential element of the bargain," the Second Circuit
upheld the wire fraud conviction.  *Id.* at 421.  Further, although no pecuniary
harm was alleged, the Second Circuit noted that the dealer was "deprived … of
the right to define the terms for the sale of its property," which "cost it … good
will."  *Id.* at 421.

21

Here, as in *Schwartz*, the overall scheme depended upon the alleged misrepresentations for completion.  Specifically, the representation that straw buyers made to dealers that they would not export the purchased vehicles is alleged to have been essential to the bargain.  (Am. Compl. ¶ 16 ("As a result of these false representations concerning the buyer's intended use of the vehicle, which allow the dealership to assure the manufacturer that the vehicle is not being immediately exported, the dealership sells the vehicle to the straw buyer.")).  *Cf. $52,037.96*, 2014 WL 7399377, at *4 ("Here, the government's fraud allegations rest on the testimony of the BMW dealership indicating that it would not have entered into the contract had it known that the BMW would be immediately sent overseas for resale .... [A]s the alleged misrepresentation was an act of omission, it seems the government ought to demonstrate a duty on behalf of the buyer to reveal any plan to export a newly purchased vehicle.  No such duty has been alleged.").  Moreover, the misrepresentations here are alleged to have caused a more concrete and tangible harm than the loss of "good will" suffered in *Schwartz*.  The Amended Complaint alleges pecuniary harm suffered by the dealers, to whom the straw purchasers are alleged to have made direct misrepresentations, as well as by the manufacturers and insurers, which are alleged to have been duped by other aspects of the scheme.

Next, Claimants argue that the Government has failed to plead a "convergence of the deceived and the injured."  (Clmt. Br. 22 (citing *United States* v. *Evans*, 844 F.2d 36, 39 (2d Cir. 1988) ("If a scheme to defraud must

involve the deceptive obtaining of property, the conclusion seems logical that the deceived party must lose some money or property.")))  As it happens, the Government has alleged just such a convergence.  Although the party most harmed by the scheme may have been the manufacturers, the Amended Complaint also contains allegations of harm to dealers, which would establish a convergence of the deceived and the injured.  (*See* Am. Compl. ¶ 16 ("As part of the broker's scheme to purchase the vehicle in this manner, false statements are often made to the dealership concerning the buyer's intended use of the vehicle."); *id.* at ¶ 20(b) ("Some dealerships have, in fact, been assessed charge backs by the manufacturers, along with other penalties, for selling cars that have been exported pursuant to the scheme."))  Assuming *arguendo* there were a convergence requirement, it would be satisfied here.

Significantly, however, "[t]he Second Circuit has not adopted a convergence requirement, and has explicitly held that lack of convergence is not a bar to a claim of wire or mail fraud."  *United States* v. *Chalmers*, 474 F. Supp. 2d 555, 563 n.3 (S.D.N.Y. 2007) (internal citation omitted); *see also United States* v. *Eisen*, 974 F.2d 246, 253 (2d Cir. 1992) (declining to adopt convergence theory); *see generally Ideal Steel Supply Corp.* v. *Anza*, 373 F.3d 251, 262-63 (2d Cir. 2004) ("This Court has not held that [a] plaintiff who alleges mail fraud or wire fraud must have been the entity that relied on the fraud."), *rev'd in part and vacated in part on other grounds*, 547 U.S. 451 (2006); *Trautz* v. *Weisman*, 819 F. Supp. 282, 286 (S.D.N.Y. 1993) (rejecting

23

convergence theory); *Shaw* v. *Rolex Watch U.S.A.*, Inc., 726 F. Supp. 969, 973 (S.D.N.Y. 1989) (same).  That the Amended Complaint alleges *manufacturers* were harmed, and *dealers* were lied to, is accordingly sufficient.

Claimants' argument that the Government has failed to plead a loss of "money or property" is similarly unavailing.  The *Evans* case, which held that the United States' interest in regulating foreign resale of weapons did not constitute a cognizable property interest, is inapposite.  In *Evans*, the United States — the party alleged to be injured by the scheme — was deceived, but "had lost no money or property."  844 F.2d at 38.  Here, unlike in *Evans*, the Government has alleged an actual loss of "money or property" as a result of the scheme.  (Am. Compl. ¶ 20(a)-(c)).  Accordingly, this element of the Government's mail and wire fraud claims is satisfied.

Finally, Claimants argue that the allegations regarding misrepresentations made to insurance companies are legally insufficient to support the Government's mail and wire fraud claims because (i) the "insurance applications made by [particular straw buyers] do not pertain to any of the 48 vehicles in the present forfeiture proceeding," and (ii) the Amended Complaint does not specify that Efans "requested or even encouraged anyone to make false statements to insurance companies."  (Clmt. Br. 25-26).  But this argument must fail because Claimants attempt to hold the Government to a higher burden at the motion to dismiss stage than is proper.  The Government is not required to prove its claims; it must simply "state

24

sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial." Supp. R. G(2)(f). That it has done.

The Amended Complaint details interactions between and among Efans, the straw buyers, the dealers, and the insurance companies. Based on these allegations, it is more than reasonable to believe that the Government, after it has had the benefit of conducting discovery, will be able to meet its burden of proof at trial of demonstrating probable cause for the forfeiture of the particular vehicles seized. *See* 19 U.S.C. § 1615 (establishing the Government's burden of proof). Perhaps more significantly, there is no reason why the representations made to the insurance companies, which constitute a relatively small part of the whole scheme, need be scrutinized in a vacuum. The Court has already determined that the alleged misrepresentations made to the dealers are sufficient to support the Government's mail and wire fraud claims at this stage, and need not determine whether the misrepresentations made to insurance companies, if alleged alone, would be sufficient.

### c. The Amended Complaint Establishes a Basis for *In Rem* Jurisdiction

Claimants also challenge the jurisdiction of this Court over Eight Vehicles and Twenty-Eight Vehicles. They argue that, because neither group of Defendants-in-rem was physically present within the Southern District of New York on November 8, 2013, the date the Government filed its original Complaint, *in rem* jurisdiction over Eight Vehicles and Twenty-Eight Vehicles is

lacking.  (Clmt. Br. 26-27).  The Court disagrees, and finds the exercise of *in rem* jurisdiction over Eight Vehicles and Twenty-Eight Vehicles to be appropriate.

"A forfeiture action or proceeding may be brought in … the district court for the district in which any of the acts or omissions giving rise to the forfeiture occurred[.]"  28 U.S.C. § 1355(b)(1).  Additionally, "[a]ny court with jurisdiction over a forfeiture action pursuant to [§ 1355(b)] may issue and cause to be served in any other district such process as may be required to bring before the court the property that is the subject of the forfeiture action."  *Id.* § 1355(d).  These provisions extend even to "property … located in a foreign country."  28 U.S.C. § 1355(b)(2).

Although Claimants argue that the Court should ascribe particular significance in its jurisdictional analysis to the location of the Defendants-in-rem when the Government initially filed suit (*see* Clmt. Br. 26-27), they cite no authority for this assertion.[10]  This Court will not tarry on this issue, however,

---

[10]    Claimants cite a Second Circuit case for the proposition that the location of the *res* at the time of filing is critical to the jurisdictional analysis.  (*See* Clmt. Br. 25 (citing *United States* v. *All Funds on Deposit in any Accounts Maintained in Names of Meza or De Castro*, 63 F.3d 148, 153 (2d Cir. 1995))).  But the *res* in *Meza* comprised funds located in a British bank account, and the physical location of the funds remained constant throughout the various stages of the litigation.  There is nothing in *Meza* that indicates the location of the *res* at the time of filing was more important than the location of the funds at any other point in the litigation.  Other cases cited by Claimants are no more helpful on this point.  To the contrary, *One Caribou Aircraft*, a district court case cited by Claimants, explicitly holds — albeit in the context of Supplemental Rule C — that the location of the property at the time of filing has no special significance as long as it is alleged that the property will subsequently be brought into the district.  *See United States* v. *One Caribou Aircraft Registration No. N-1017-H*, 557 F. Supp. 379, 380 (D.P.R. 1983) ("Defendant's contention is that for the arrest to be valid the property to be arrested … had to be within the court's jurisdiction at the time the complaint for

26

as the Government has demonstrated that *in rem* jurisdiction existed when the original Complaint was filed, as well as when the Amended Complaint was filed.

There is no dispute that the Eight Vehicles were seized in Newark, New Jersey, and that the Twenty-Eight Vehicles were seized while at sea (presumably outside the territorial waters of the Southern District of New York). However, pursuant to § 1355(b)(1), the location of the seized property is immaterial so long as "acts or omissions giving rise to the forfeiture occurred" within the Southern District of New York.[11] In this case, such acts did occur within this District. (*See* Am. Compl. ¶¶ 23, 37, 47).

Nor is there a question of whether the property was seized by the Government at the time the original Complaint was filed. It is true that "the

---

forfeiture was filed and that its allegedly illegal transfer to this jurisdiction could not cure this defect. Defendant's argument that the property must have been within the jurisdiction of this court when the libel was filed is defeated by the plain language of the applicable rule[.]"); *see generally* Rule C ("In an action in rem the complaint must ... state that the property is within the district or will be within the district while the action is pending."). Although Supplemental Rule G applies to this action, its requirement for forfeiture complaints is even more lenient than Supplemental Rule C when it comes to the location of the *res*. Specifically, Rule G requires that the Government merely "state its location when any seizure occurred and — if different — its location when the action is filed."

[11] The Court notes that there is no allegation that the property at issue was, at any time, located in a foreign country. *Cf. Meza*, 63 F.3d at 153 (requiring a showing of "constructive control" over funds located in a British bank account). Accordingly, it is not necessary to consider whether the property was within the "constructive control" of this Court. To the extent a showing of "constructive control" is necessary in cases where property is in limbo between the United States and another foreign country, this showing would be easily met here, where the United States' control over the property is manifest. At the request of the Government, CBP placed a hold on the property and the property was returned to the United States. No cooperation with foreign governments was alleged to have been required to seize this property, or to secure its return.

court must have actual or constructive control of the *res* when an *in rem* forfeiture suit is initiated." *Republic Nat. Bank of Miami* v. *United States*, 506 U.S. 80, 87 (1992). But this requirement is satisfied when the property has been seized and the complaint is filed while the property remains seized, as happened here. *Cf. id.* ("If the seizing party abandons the attachment prior to filing an action, it, in effect, has renounced its claim. The result is to purge away all the prior rights acquired by the seizure, and, unless a new seizure is made, the case may not commence." (internal quotation marks omitted)). Accordingly, the Court agrees with the Government that the facts alleged are sufficient to confer jurisdiction over the vehicles.

Moreover, even if the Court could not have exercised jurisdiction *in rem* over property located outside this District at the time of filing the original Complaint, the Government has since sought — and the Clerk of Court has issued — arrest warrants *in rem*. (*See* Gov't Opp., Ex. B, C). Contrary to Claimants' assertion (*see* Clmt. Reply 10-11), such a procedure is explicitly contemplated by statute and permitted by the Supplemental Rules. *See* 28 U.S.C. § 1355(d) ("Any court with jurisdiction over a forfeiture action ... may issue and cause to be served in any other district such process as may be required to bring before the court the property that is the subject of the forfeiture action."); Supp. R. G(3)(b)(i) ("If the defendant[-in-rem] is not real property ... the clerk must issue a warrant to arrest the property if it is in the government's possession, custody, or control."); *see also United States* v.

28

*Certain Funds Located at Hong Kong & Shanghai Banking Corp.*, 96 F.3d 20, 22 (2d Cir. 1996) ("[T]he statute conferring jurisdiction on federal courts over civil forfeiture proceedings was amended to provide district courts with *in rem* jurisdiction over a *res* located in a foreign country."); *Meza*, 63 F.3d at 152 ("[B]y allowing nationwide service of process, newly adopted § 1355(d) clearly provides districts courts with the required control over property located within the United States.").  Accordingly, Claimants' challenge to the Court's jurisdiction over the Eight Vehicles and the Twenty-Eight Vehicles fails.

### d.    The Government's Forfeiture Allegations Regarding the Unicorn Renasant Account Are Sufficient

Claimants argue that the forfeiture claim to one of the seized accounts — the Unicorn Renasant Account — must be dismissed because the funds were not "*used to facilitate the exporting or sending of such merchandise.*" (Clmt. Br. 28 (emphasis in Claimants' brief)).  If the operative statutory provision contained only the portion quoted by Claimants, the Court might agree.  However, as the Government correctly notes (*see* Gov't Opp. 29), this provision contains more.  Significantly, "property used to facilitate the ... receipt, *purchase*, transportation, concealment, or sale of such merchandise prior to exportation shall be seized and forfeited to the United States."  19 U.S.C. § 1595a(d) (emphasis added).  The Government has alleged that funds from the Unicorn Renasant Account were transferred to other bank accounts, which served as a source of funding for the purchase of merchandise — luxury cars — by Efans.  (*See* Am. Compl. ¶ 31).  Moreover, the

link between the Unicorn Renasant Account and the other Defendants-in-rem is not overly attenuated. The Government alleges that Owner-1 and Owner-2 — who control the Unicorn Regions Account and the Efans Regions Account — also control the Unicorn Renasant Account. (*Id.* at ¶¶ 29-30). Funds are alleged to flow through all three accounts during the scheme, with the object of the funds being the purchase of vehicles for immediate export. (*Id.* at ¶¶ 29-31). These allegations are sufficient to support a reasonable belief that the Government will be able to demonstrate probable cause for forfeiture of funds from the Unicorn Renasant Account at trial. *See* 19 U.S.C. § 1615; Supp. G(2)(f).

Accordingly, for the reasons stated above, Claimants' motion to dismiss the Amended Complaint is denied in its entirety.

### 2.    Defendants' Motion for a Probable Cause Hearing Is Denied

In addition to attacking the sufficiency of the Government's forfeiture complaint, Claimants have also moved for a probable cause hearing to determine whether the Government "can demonstrate adequate probable cause to seize and retain possession" of the Defendants-in-rem. (Clmt. Hrg. Br. 2). The Government opposes this request, arguing that such a hearing is not required under the Supplemental Rules, the Constitution, or any other binding authority. (*See* Gov't Hrg. Opp. 8-25). The Court agrees.

To begin with, Supplemental Rule G does not afford forfeiture claimants to personal property with such a remedy. Under Supplemental Rule G,

30

claimants are permitted to file certain pretrial motions, one of which, a motion to dismiss, Claimants have already filed. *See* Supp. R. G(8)(b). Under certain circumstances, Supplemental Rule G affords claimants with the opportunity to file a Petition to Release Property, *see* Supp. R. G(8)(d); however, this subsection only applies to civil forfeiture actions governed by 18 U.S.C. § 983(f), and not the Title 19 forfeiture provision at issue in the instant action. Claimants who seek to have "real property" returned are also permitted the opportunity to contest the seizure. *See* Supp. R. G(3) (citing 18 U.S.C. § 985 ("If the court authorizes a seizure of real property …, it shall conduct a prompt post-seizure hearing during which the property owner shall have an opportunity to contest the basis for the seizure.")). This provision self-evidently does not apply to the claims at issue here, which concern personal property.

Similarly, there are no provisions in Supplemental Rules C and E — rules that apply in the absence of a contrary provision in Supplemental Rule G, *see* Supp. R. G(1) — that afford Claimants the relief they now request. Supplemental Rule E, which calls for a "prompt hearing at which the plaintiff shall be required to show why the … attachment should not be vacated" has, by its own terms, "no application … to actions by the United States for forfeitures[.]" Supp. R. E(4)(f). In sum, each provision in the Supplemental Rules that could conceivably authorize the instant motion does not.

Turning to the question of whether the Constitution affords Claimants a right to a hearing, the Court takes its counsel from the Supreme Court's

31

decision in *Kaley* v. *United States*, 134 S. Ct. 1090 (2014).  In *Kaley*, two criminal defendants wishing to hire an attorney challenged a pretrial restraint on their property.  134 S. Ct. at 1105.  The Supreme Court held that the defendants were not constitutionally entitled to a hearing to contest a grand jury's prior determination of probable cause to believe they committed the crimes charged.  *Id.*  In so holding, the Court noted it "has repeatedly declined to require the use of adversarial procedures to make probable cause determinations."  *Id.* at 1103.

Here, with respect to all Defendants-in-rem except the Twenty-Eight Vehicles and the Eight Vehicles, a probable cause determination has been made by two magistrate judges.  That the probable cause determination was made by two magistrate judges — and not by a grand jury — makes no difference to the analysis.  Significantly, in *Kaley*, the Supreme Court reaffirmed its endorsement of a probable cause determination made without recourse to "adversarial procedures."  *Kaley*, 134 S. Ct. at 1103.  Moreover, a determination of probable cause by a magistrate judge in this context is entitled to great deference.  *See Marine Midland Bank, N.A.* v. *United States*, 11 F.3d 1119, 1125 (2d Cir. 1993) ("In reviewing seizure warrants, we accord great deference to the probable cause determinations made by the magistrates and judges who issue warrants; we resolve any doubts in favor of upholding warrants.").  Consequently, the Court finds that Claimants "have no right to relitigate th[e] [probable cause] finding."  *Kaley*, 134 S. Ct. at 1094; *see also*

*United States* v. *Dupree*, 781 F. Supp. 2d 115, 133 (E.D.N.Y. 2011) ("[G]iven the deference to be accorded to the determination of magistrate judges …, defendants' request for a hearing to determine whether the least restrictive means of securing the funds was used is denied.").

With respect to the Twenty-Eight Vehicles and the Eight Vehicles, which the Government seized without obtaining a warrant from a magistrate judge, the direct application of *Kaley* is less clear. Accordingly, the Court will — as Claimants suggest (*see* Clmt. Hrg. Br. 9) — apply the *Mathews* v. *Eldridge* balancing test to determine whether the demands of the Due Process Clause of the Constitution are satisfied. *See Krimstock* v. *Kelly*, 306 F.3d 40, 60 (2d Cir. 2002) (citing *Mathews* v. *Eldridge*, 424 U.S. 319, 335 (1976)).[12] The test considers: (i) the private interest affected; (ii) the Government's interest; and (iii) the risk of erroneous deprivation through the procedures used and the value of other safeguards. *Id.* Considering those factors, the Court finds that they tilt in favor of the Government.

To begin the *Mathews* analysis, Claimants' interest in having their property returned is far less significant than the interests implicated in the

---

[12] The Court notes the Government's opposition to the application of *Mathews* here. But to the extent the Supreme Court's decision in *Kaley* limits the application of *Mathews*, it likely does so only in cases where the claimant seeks a hearing to relitigate a probable cause determination already made by a neutral party. *See Kaley*, 134 S. Ct. at 1101 ("We decline to … define the … reach of *Mathews* … because we need not do so. Even if *Mathews* applied here — even if, that is, its balancing inquiry were capable of trumping this Court's repeated admonitions that the grand jury's word is conclusive — the [defendants] still would not be entitled to the hearing they seek."); *see also id.* at 1111 n.4 (Roberts, C.J., dissenting) ("Under our due process precedents, it is clear that the *Mathews* test applies in this case[.]").

cases on which they rely.  In *Krimstock*, for example, the seized property also consisted of vehicles.  306 F.3d at 61.  However, these vehicles were not mere inventory, as they are in this case; rather, they were the personal vehicles used by individuals who needed them for daily transportation.  *Id.* ("The particular importance of motor vehicles derives from their use as a mode of transportation and, for some, the means to earn a livelihood.").

With respect to the interest in the return of the seized funds, Claimants' interest pales in comparison to that typically shown by individuals seeking a hearing to determine whether seized assets should be returned before trial. Indeed, the prototypical request for such a hearing is predicated upon an argument of constitutional necessity, as where a defendant in a criminal case requires the seized funds to retain counsel.  *See United States* v. *Bonventre*, 720 F.3d 126, 131 (2d Cir. 2013) (affirming *Monsanto* or "*Monsanto*-like" hearings under certain circumstances).[13]  Even in such a context, "[t]o even be entitled to the hearing, [a] defendant[] must first show a genuine need to use the assets to retain counsel of choice."  *Kaley*, 134 S. Ct. at 1112 (Roberts,

---

[13]    In *United States* v. *Monsanto*, 924 F.2d 1186, 1203 (2d Cir. 1991) (en banc), the Second Circuit concluded, in light of the Fifth and Sixth Amendments, that a criminal defendant who is seeking to use restrained funds to hire counsel of choice is entitled to an adversarial, pretrial hearing at which the court evaluates whether there is probable cause to believe that (i) the defendant committed the crimes that provide the basis for the forfeiture; and (ii) the contested funds are properly forfeitable.  The Court in *Bonventre* explained that, in the wake of *Monsanto*, "[d]istrict courts in this circuit have found that a defendant may also have the right to a *Monsanto*-like hearing in the civil context when, [as in that case], the civil forfeiture action may affect the defendant's right to counsel in a parallel criminal case.  720 F.3d at 130.  As is plain from the remainder of this Opinion, Claimants can draw no analogy in the present case.

C.J., dissenting) (citing *Bonventre*).  Here, Claimants' interest in the property is not extraordinary, but rather is that which any company would have in seeking the return of funds and inventory; more to the point, the pretrial deprivation here does not touch upon a collateral need that is fundamental, as it does in the context of *Monsanto* hearings.

With respect to the second factor, the Court finds that the Government has a tangible interest in avoiding such a hearing under the circumstances.

> At the least, such an adversarial proceeding — think of it as a pre-trial mini-trial (or maybe a pre-trial not-so-mini-trial) — could consume significant prosecutorial time and resources.  The hearing presumably would rehearse the case's merits, including the Government's theory and supporting evidence.  And the Government also might have to litigate a range of ancillary questions relating to the conduct of the hearing itself[.]

*Kaley*, 134 S. Ct. at 1101 (majority opinion).  For the Government to engage in such a hearing before discovery has even been exchanged would certainly constitute a burden.  However, much like Claimants' interest, consideration of this factor fails to tilt the balance significantly in the Government's favor.

The remaining factor of the *Mathews* test — "critical when the governmental and private interests both have weight" — requires the Court to consider the risk of erroneous deprivation through the procedures used and the value of other safeguards.  *Kaley*, 134 S. Ct. at 1103.  Under these circumstances, Supplemental Rule G provides Claimants with an adequate procedure to contest the seizure of Claimants' property, namely, trial.  *See* Supp. R. G(9); *see also Kaley*, 134 S. Ct. at 1104 ("No doubt the [defendants]

could seek to poke holes in the evidence the Government offered … to support those allegations.  No doubt, too, the [defendants] could present evidence of their own, which might cast the Government's in a different light[.]  Our criminal justice system of course relies on such contestation at trial[.]"); *United States* v. *Von Neumann*, 474 U.S. 242, 249 (1986) ("[T]he forfeiture proceeding, without more, provides the post-seizure hearing required by due process.").

The Court also finds that there is little gained in holding a probable cause hearing in this case.  First, as the Supreme Court has noted, "an adversarial process is far less useful to the threshold finding of probable cause, which determines only whether adequate grounds exist to proceed to trial[.]" *Kaley*, 134 S. Ct. at 1104.  Second, although no neutral party has made a probable cause determination with respect to the Eight Vehicles and the Twenty-Eight Vehicles, the risk of error appears low for the simple reason that a magistrate judge has already found probable cause to seize the Twelve Vehicles.  (*See* Am. Compl. ¶ 46).  Like the Twelve Vehicles, the Eight Vehicles and the Twenty-Eight Vehicles were located in shipping containers intended for export.  As such, the property seized pursuant to warrants issued by the Clerk of Court has the same link to the alleged scheme as the property seized pursuant to the warrant signed by the magistrate judge.  In sum, having considered Claimants' arguments in light of *Kaley* and *Mathews*, the Court denies Claimants' request for a probable cause hearing.

36

## CONCLUSION

For the reasons discussed herein, Defendant's motion to dismiss is DENIED. Defendants' motion for a probable cause hearing is also DENIED. The Clerk of Court is directed to terminate Docket Entries 22 and 31.

The parties are hereby ORDERED to appear for a conference on February 10, 2015, at 10:00 a.m. in Courtroom 618 of the Thurgood Marshall Courthouse, 40 Foley Square, New York, New York, to set a schedule for discovery. The parties should submit a proposed Case Management Plan to the Court in PDF format by February 5, 2015.

Additionally, the parties shall be prepared to address at the conference how to proceed with respect to the one vehicle (currently considered part of Eight Vehicles) to which Claimants deny ownership. (*See* Clmt. Hrg. Br. 10 n.2; Govt. Hrg. Opp. 5 n.3).

SO ORDERED.

Dated:      January 20, 2015
            New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge