UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X
                                  :

UNITED STATES OF AMERICA,         :
                                 :

                 Plaintiff,     :        13 Civ. 7983 (KPF)
                                 :

               v.          :        OPINION AND ORDER
                                 :

ANY AND ALL FUNDS ON DEPOSIT IN   :
ACCOUNT NUMBER 0139874788, AT    :
REGIONS BANK, HELD IN THE NAME OF :
EFANS TRADING CORPORATION, *et al.*, :
                                 :

            Defendants-in-rem. :
                                 :
-------------------------------------------------------X

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #: _____
> DATE FILED: <u>August 29, 2016</u>

KATHERINE POLK FAILLA, District Judge:

      On November 8, 2013, the United States of America (the "Government")
filed a verified complaint seeking civil forfeiture of 48 seized cars and funds
seized from four bank accounts. Claims over 47 of the cars and three of the
accounts (the "Defendants-in-rem") have been filed by Unicorn Tire Corporation
("Unicorn") and Efans Trading Corporation ("Efans") (collectively, "Claimants").
On January 15, 2016, the Government moved for summary judgment. While it
is an exceptionally close call, the record evidence concerning Claimants'
knowledge of potential harms to the cars' manufacturers implicates issues of
materiality and credibility, both of which foreclose summary judgment. For
these reasons, the Government's motion is denied.

BACKGROUND[1]

The Court presumes familiarity with the facts and procedural history set forth in its prior decision denying Claimants' motion to dismiss, *United States* v. *Any & all Funds on Deposit in Account No. 0139874788, at Regions Bank, held in the name of Efans Trading Corp.*, No. 13 Civ. 7983 (KPF), 2015 WL 247391 (S.D.N.Y. Jan. 20, 2015) ("*Efans I*").  For convenience, the facts relevant to this Opinion are set forth below.

## A.    Factual History

### 1.    Claimants

#### a.    Unicorn Tire Corporation

Unicorn Tire Corporation is a tire importing business owned by Erxin Zhou.  (*See* Gov't 56.1 ¶ 5; Cl. 56.1 ¶¶ 5, 100-01).  Unicorn imports tires from China, and then sells them to customers in the United States, Canada, Mexico,

---

[1]    The facts in this Opinion are drawn from the parties' submissions in connection with the motion for summary judgment, including the Government's Local Rule 56.1 Statement ("Gov't 56.1" (Dkt. #81)), Claimants' Rule 56.1 Counter-Statement ("Cl. 56.1" (Dkt. #88)), and various declarations from attorneys and witnesses ("[Name] Decl." (Dkt. #79-80, 89-92, 97)).  Citations to a party's Rule 56.1 Statement incorporate by reference the documents and testimony cited therein.  Where facts stated in a party's Rule 56.1 Statement are supported by testimonial or documentary evidence, and denied with only a conclusory statement by the other party, the Court finds such facts to be true.  *See* Local Civil Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a corresponding numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

For convenience, the Court will refer to the Government's opening brief as "Gov't Br." (Dkt. #78); Claimants' opposition brief as "Cl. Opp." (Dkt. #87); and the Government's reply brief as "Gov't Reply" (Dkt. #96).

Europe, and Japan.  (Cl. 56.1 ¶ 101).  Unicorn maintains an office in Memphis, Tennessee, and is associated with two U.S. bank accounts that are at issue in this matter: (i) an account at Regions Bank, ending in the digits 3099 (the "Unicorn Regions Account"); and (i) an account at Renasant Bank, ending in the digits 6888 (the "Unicorn Renasant Account").  (Gov't 56.1 ¶¶ 1, 10).

### b.   Efans Trading Corporation

In early 2011, Zhou's husband, Yifan Kong, started an auto-export business, which he named Efans Trading Corporation.  (Cl. 56.1 ¶ 104). Between 2011 and 2013, Efans purchased approximately 2,000 luxury cars from dealerships in the United States and then sent these cars to customers in China.  (*See* Gov't 56.1 ¶¶ 2-3).  The Chinese customers paid Efans for each car, often by wiring money to an account that Efans held at Regions Bank (the "Efans Regions Account").   (*Id.* at ¶ 13).  Efans earned roughly $200 to $3,000 in profits for each vehicle exported.  (*Id.* at ¶ 4).

### c.   Links Between Unicorn and Efans

Unicorn and Efans shared an office building, and shared some staff. (*See* Gov't 56.1 ¶ 1 (noting Unicorn and Efans' shared address); *id.* at ¶ 8 (explaining that Zhou did some work for Efans, in addition to her work for Unicorn)).  In addition, Unicorn frequently used its resources to help support Efans.  For example, all Efans employees used Unicorn Tire email addresses and were paid from Unicorn's bank accounts.  (*Id.* at ¶ 6).  Moreover, Unicorn occasionally transferred funds from its own bank account to the Efans Regions

3

Account.  (*Id.* at ¶ 14).  Finally, Unicorn obtained a loan from Regions Bank to aid both its own business and Efans' business.  (Cl. 56.1 ¶ 15).

### 2. Dealerships

Mercedes-Benz USA, LLC ("MBUSA"), Jaguar Land Rover North America ("Jaguar Land Rover"), BMW North America ("BMW"), and Ford Motor Company ("Ford") (collectively, the "Manufacturers") supply luxury cars to dealerships across the United States.  (*See* Gov't 56.1 ¶¶ 19-20).  The dealerships then sell the vehicles to individual drivers.  (*See id.* at ¶ 20).  Dealerships are required to maintain accurate lists of the drivers who buy their cars and to share these lists with the Manufacturers.  (*Id.* at ¶ 23).

MBUSA, Jaguar Land Rover, and BMW all have "no-export" policies, which provide that their dealerships may be penalized for selling new vehicles to exporters.  (*See* Gov't 56.1 ¶ 21).  Similarly, Ford penalizes dealerships that sell "to 'brokers' or 'resellers,'" including "brokers and/or individuals who ultimately export [Ford] vehicles."  (Paul Decl., Ex. 12; *accord* Gov't 56.1 ¶ 22).  The penalties take a variety of forms, including: (i) monetary fines, which are sometimes called "charge-backs"; and (ii) reductions in the number of vehicles that the dealerships are allowed to sell.  (Gov't 56.1 ¶¶ 21-22).

### 3. Efans' Alleged Fraud

It is undisputed that Efans supplied Mercedes-Benz, Land Rover, BMW, and Ford vehicles to customers in China.  (*See* Gov't 56.1 ¶ 3).  Under Efans' business model, a Chinese customer would contact Efans and place an order

4

for a particular vehicle.  (*See id.* at ¶ 49).  Then, Efans would hire a broker to purchase the vehicle from a dealership in the United States.  (*Id.*).  The broker would purchase the vehicle in his or her own name, or in the name of a third party who lived close to the dealership.  (*Id.* at ¶ 56).  However, the broker would often pay for the car using a cashier's check drawn on Efans' bank account.  (*Id.* at ¶ 12).  Once the broker obtained the car from the dealership, the car was immediately exported to the Chinese customer who ordered it. (*See id.* at ¶ 49).

One of the brokers who purchased vehicles on behalf of Efans customers was Shane Martin.  (*See* Gov't 56.1 ¶ 51).  Mr. Martin had a home improvement business until 2011, when he met Kong and Zhou.  (*See id.* at ¶ 52; Cl. 56.1 ¶ 52).  At that point, Martin began purchasing vehicles for Efans customers at several car dealerships.  (See Paul Decl., Ex. 4 at 29).  Martin bought some of these vehicles in his own name.  (*Id.*).  On other occasions, Martin bought a vehicle in the name of "a friend" because the dealership had "request[ed] … a purchaser that live[d] in their area."  (*Id.* at 30).  And "a lot of times, the dealerships would help supply the buyer" if Martin had the money to purchase a vehicle, but "was unable to meet all the [dealership's] requests."  (*Id.*).  Efans paid Martin approximately $1,000 for each car that he acquired — in his own name or a third party's name — for Efans' customers.  (*See* Gov't 56.1 ¶ 54).

5

**B.     Procedural History**

On November 8, 2013, the Government initiated this forfeiture action against 48 seized vehicles and the contents of four bank accounts.  (Dkt. #1; *see* Dkt. #21 (amended complaint)).  According to the Government, these assets were either: (i) the products of wire fraud, as that offense is defined in 18 U.S.C. § 1343; or (ii) used to facilitate wire fraud.  (*See id.*; *see generally* Gov't Br.).

On December 11, 2013, Claimants submitted claims for the Defendants-in-rem, which comprise the Efans Regions Account, the Unicorn Regions Account, the Unicorn Renasant Account, and 47 vehicles that Efans attempted to export.  Nearly two months later, on February 3, 2014, Claimants filed a motion to dismiss the forfeiture action.  (Dkt. #15).  The Court dismissed this motion in an Opinion and Order dated January 20, 2015.  *See Efans I.*

On January 15, 2016, the Government filed the instant motion for summary judgment as to the Defendants-in-rem.  (Dkt. #77-82).  Claimants filed their opposition papers on February 4, 2016 (Dkt. #87-94), and the Government concluded the briefing with its reply dated February 12, 2016 (Dkt. #95).[2]

---

[2]     The Government has clarified that it intends to proceed separately, by default judgment application, to forfeit the contents of one bank account and one vehicle as to which no one has filed a claim.  (Gov't Br. 1 n.1).

6

## DISCUSSION

### A.      Applicable Law

#### 1.      Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986); *accord Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact."  *Celotex*, 477 U.S. at 323.  A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248; *see also Jeffreys* v. *City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*).  The movant may discharge this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322; *see also Selevan* v. *N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (finding summary judgment appropriate where the non-moving party fails to "come forth with evidence sufficient to permit a reasonable juror to return a verdict in

his or her favor on an essential element of a claim" (internal quotation marks omitted)).

If the moving party meets this burden, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial" using affidavits or otherwise, and cannot rely on the "mere allegations or denials" contained in the pleadings. *Anderson*, 477 U.S. at 248; *see also Wright* v. *Goord*, 554 F.3d 255, 266 (2d Cir. 2009). In other words, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight* v. *U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986).

"When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc.* v. *CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). However, in considering "what may reasonably be inferred" from witness testimony, the court should not accord the non-moving party the benefit of "unreasonable inferences, or inferences at war with undisputed facts." *Berk* v. *St. Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334, 342 (S.D.N.Y. 2005) (citing *County of Suffolk* v. *Long Island Lighting Co.*, 907 F.2d 1295, 1318 (2d Cir. 1990)).

8

### 2.      Forfeiture Actions Under 19 U.S.C. § 1595a(d)

The Government brought this case pursuant to 19 U.S.C. § 1595a(d),

which provides:

> Merchandise exported or sent from the United States or
> attempted to be exported or sent from the United States
> contrary to law, or the proceeds or value thereof, and
> property used to facilitate the exporting or sending of
> such merchandise, the attempted exporting or sending
> of such merchandise, or the receipt, purchase,
> transportation, concealment, or sale of such
> merchandise prior to exportation shall be seized and
> forfeited to the United States.

Under this provision, merchandise may be "exported … contrary to law" if the

merchandise is obtained and exported in a fraudulent manner.  *See Efans I*,

2015 WL 247391, at *7.

When a court evaluates a forfeiture claim under 19 U.S.C. § 1595a(d), it

must apply the standard set forth in 19 U.S.C. § 1615.  *See United States* v.

*Davis*, 648 F.3d 84, 96 (2d Cir. 2011).  Under that standard, the Government

bears the initial burden of demonstrating probable cause to believe that the

property is subject to forfeiture.  *See id.* at 95-96.  The burden then shifts to

the claimants to show, by a preponderance of the evidence, that the property is

not subject to forfeiture.  *See id.*

Consequently, in evaluating this motion for summary judgment, the

Court must first ask whether the Government has demonstrated probable

cause to believe that the defendant vehicles and funds are subject to forfeiture.

Then, construing the evidence in the light most favorable to Claimants, the

Court must ask whether a reasonable jury could find that Claimants have proven a defense to forfeiture by a preponderance of the evidence. *See United States* v. *One Parcel of Prop. Located at 15 Black Ledge Drive, Marlborough, Conn.*, 897 F.2d 97, 102 (2d Cir. 1990) (applying the summary judgment rules articulated in *Anderson* to a forfeiture case involving the § 1615 burden-shifting scheme).

### B.    Analysis

The Government maintains that Efans exported vehicles "contrary to law" because Efans obtained its vehicles in violation of the wire fraud statute, 18 U.S.C. § 1343.  Under that statute, it is unlawful to "devise any scheme or artifice to defraud" someone out of "money or property" through the use of any "wire, radio, or television communication in interstate or foreign commerce." 18 U.S.C. § 1343; *see also United States* v. *Binday*, 804 F.3d 558, 569 (2d Cir. 2015) (explaining that the "essential elements" of wire fraud are: "[i] a scheme to defraud, [ii] money or property as the object of the scheme, and [iii] use of the … wires to further the scheme").  The Government contends that there is adequate evidence in the record to say — as a matter of law — that Efans' conduct satisfies all the elements of the wire fraud statute.  The Court is not as convinced.

While the wire fraud statute does not define a "scheme to or artifice to defraud," *see* 18 U.S.C. § 1343; *United States* v. *Autuori*, 212 F.3d 105, 115 (2d Cir. 2000), the Second Circuit has explained that a scheme to defraud is

10

characterized by deceptive conduct and an intent to cause harm, *see Autuori*, 212 F.3d at 115 (explaining that a "scheme to defraud" is characterized by "trick, deceit, chicane or overreaching" (quoting *McNally* v. *United States*, 483 U.S. 350, 358 (1987))); *United States* v. *D'Amato*, 39 F.3d 1249, 1257 (2d Cir. 1994) ("[T]he deceit must be coupled with a contemplated harm to the victim." (internal quotation marks and citation omitted)); *United States* v. *Shellef*, 507 F.3d 82, 107-08 (2d Cir. 2007) (same).  In this case, when the evidence is construed in the light most favorable to Claimants, it suggests that: (i) Efans used deceptive conduct to acquire at least some of its vehicles; but (ii) when Efans engaged in this deception, it lacked the requisite intent to cause harm.

### 1.    Deceptive Conduct

When the evidence in the record is construed in the light most favorable to Claimants, it suggests that Efans acquired some of its vehicles honestly and others deceptively.  According to Kong, Zhou, and Martin, Efans' brokers were instructed to purchase cars from dealerships that were interested in selling to exporters.  (Cl. 56.1 ¶ 112).  Martin also stated that, as an Efans broker, he always "told the dealership personnel with whom [he] interacted that the cars [he] was purchasing were for export."  (Martin Decl. ¶ 7).  In addition, the record suggests that Martin purchased some cars in his own name (Paul Decl., Ex. 4 at 29), and he was not always required to sign a contract stating that the vehicle would not be exported (*see* Gov't 56.1 ¶ 83; Def. 56.1 ¶ 83).  In light of this evidence, a reasonable jury could conclude that, at least on some

11

occasions, Martin disclosed that he was purchasing a car for export, and then purchased the car in his own name, without signing a "no-export" agreement. In other words, a reasonable jury could conclude that, on at least some occasions, Martin acquired vehicles for Efans in an honest manner.

However, any reasonable jury would have to conclude that, on at least some occasions, Efans brokers utilized deceptive tactics to purchase vehicles for export *and* Efans condoned this deception. Martin explicitly testified that, on multiple occasions, he had a "friend" or another third party sign for the vehicles he purchased on behalf of Efans' customers. (Paul Decl., Ex. 4 at 29). Martin insists that dealership personnel often encouraged him to buy cars in the names of third parties who lived close to the dealerships, and sometimes dealership personnel went so far as to identify individuals who could serve as the named buyers on the vehicles that Martin purchased. (*See id.*; Martin Decl. ¶ 15). But Martin did not dispute that he was a willing participant in the plan to utilize straw buyers. (*See* Paul Decl., Ex. 4 at 29-30; Martin Decl. ¶ 15). Nor is there any dispute that Kong — the individual who owned and operated Efans — knew that Efans' brokers were using straw buyers to acquire vehicles on behalf of Efans' customers. (Gov't 56.1 ¶ 77; Cl. 56.1 ¶ 77). It is also clear that, on multiple occasions, Efans' employees asked Regions Bank to print a straw buyer's name on a cashier's check that was used to pay for a vehicle. (*See* Gov't 56.1 ¶¶ 64, 67; Cl. 56.1 ¶¶ 64, 67). Finally, there is clear evidence that, on some occasions, straw buyers contractually agreed that they

12

would not export the vehicles purchased in their name, even as they planned to give the vehicle to Efans for export.  (*See* Gov't 56.1 ¶ 92; Cl. 56.1 ¶ 92).

Taken together, this evidence strongly suggests that, for many of the vehicles that Efans acquired, Efans either: (i) worked with individual dealership employees to deceive the dealership about the identity of the person who was purchasing the vehicle; or (ii) worked with the dealership as a whole to deceive the Manufacturers about the identity of the person who was purchasing the vehicle.  Nevertheless, the Court is not prepared to say, as a matter of law, that Efans harbored an intent to harm the dealerships or the Manufacturers.

## 2.      Intent to Cause Harm

A finder of fact may infer that a defendant intends to cause harm if harm if the defendant's conduct "necessary[il]y" causes harm.  *D'Amato*, 39 F.3d at 1257.  Here, the Government contends, Efans' deceptive conduct was necessarily harmful to dealerships and manufacturers.  The Court will consider the alleged harm to each of these groups in turn.

### a.      Intent to Harm Dealerships

The Second Circuit has "drawn a fine line" between schemes that induce victims to enter into "transactions that they would otherwise avoid" — which do not necessarily cause harm — and schemes that "depend for their completion on a misrepresentation of an essential element of [a] bargain" — which necessarily hurt their victims.  *Binday*, 804 F.3d at 570-71 (quoting *Shellef*, 507 F.3d at 108).  A misrepresentation of an "essential element" is a

misrepresentation that creates a discrepancy between the benefits that a victim "reasonably anticipate[s]" from a bargain and the "actual benefits received." *United States* v. *Starr*, 816 F.2d 94, 98-99 (2d Cir. 1987); *accord D'Amato*, 39 F.3d at 1257; *Shellef*, 507 F.3d at 108.

The Government contends that Efans (perhaps in concert with a handful of unscrupulous employees at various dealerships) perpetrated a scheme in which straw buyers were asked to misrepresent an "essential element" of the bargain that they struck with dealerships. (*See* Gov't Br. 19-20). More specifically, straw buyers were asked to make a false representation that they were purchasing cars for their own use. (*See id.*). According to the Government, this false representation created a discrepancy between the benefits that dealerships reasonably anticipated from the sale of their cars and the benefits they actually received. (*See id.*). As noted above, when dealerships sell their cars to local buyers, they can rest assured that they will not have to pay "charge-backs" or other penalties to the manufacturers. In addition, dealerships selling to local customers can reasonably expect that the customers will return to the dealership to buy replacement parts and services for their vehicles. According to the Government, when dealerships sold vehicles to Efans' straw buyers — with the belief that those vehicles would remain close by — the dealerships received more liabilities and fewer assets than they bargained for. (*See id.*).

14

Unfortunately for the Government, there are some ambiguities in the record that prevent the Court from concluding as a matter of law that the dealerships received more liabilities than they "reasonably anticipate[d]." First, the Government suggests that the dealerships at issue here were making all reasonable efforts to sell to local buyers, but were tricked (by rogue employees and/or crafty brokers) into selling to straw buyers (*see* Gov't Reply 4-5); if this is true, the dealerships might not be subject to chargebacks or other penalties. (*See, e.g.*, Paul Decl., Ex. 13 ("In cases where it can be determined [that a] dealership followed sound sales processes and acted responsibly about delivery verification, an exemption from [MBUSA's] export charges may be granted."); *id.*, Ex. 15 (explaining that BMW will impose penalties on dealerships that sell to exporters *if* the dealership cannot provide documentation showing that the vehicles were delivered by a dealership employee "in compliance with the BMW of North America policy"); *id.*, Ex. 12 ¶ 9 (explaining that Ford "*may* impose charge backs" and "*may* impose other actions" on dealerships that sell to brokers (emphasis added))). In addition, in at least some instances, Efans' straw buyers contractually agreed to cover the cost of chargebacks or other penalties that might be imposed by the Manufacturers. (*See, e.g.*, Thau Decl., Ex. A ("If the Dealership is required by the Vehicle manufacturer to forfeit or repay any manufacturer incentives, allowance and/or special pricing, or if the Dealership suffers any loss or harm as a result of Purchaser's breach of [the no-export] provision, Purchaser agrees to indemnify and hold the Dealership

15

harmless from any such cost, loss or harm suffered as a result of the Purchaser's breach.")).  Consequently, the Court cannot say, as a matter of law, that all of the dealerships at issue here incurred more liabilities than they reasonably expected.

Nor can the Court conclude, as a matter of law, that the dealerships received fewer benefits than they "reasonably anticipate[d]" from their deals with the straw purchasers.  *Starr*, 816 F.2d 94 at 98-99.  Some of the non-export policies in this case only prohibited export or re-sale of vehicles for 12 months.  (*See* Paul Decl., Ex. 9 ¶ 5 (noting that, during the relevant time period, MBUSA's policy prohibited export for up to 12 months); Thau Decl., Ex. A (describing a BMW dealership's prohibition on exports "for a period of one year")).  And while *some* local customers who purchased vehicles from the relevant dealerships might later return to those dealerships within one year for replacement parts or maintenance, the Court has not seen evidence that *all* local customers later return to the dealerships to buy additional products and services in such a short period of time, or even at all.  The Court also agrees with Claimants' common-sense observations that genuine local buyers may decide to sell their cars after driving them for a few years (Cl. 56.1 ¶ 22), and that not all car owners bring their cars to dealerships (as distinguished from unaffiliated auto repair shops) for repair work or servicing.  Consequently, the Court believes that a jury should decide whether it was "reasonable[]" for the

dealerships in this case to expect that the straw buyers would give them the benefit of future business.

Finally, and most importantly, there is ample evidence in the record for a jury to conclude that the dealerships involved in this case were working *with* Efans to sell cars to Chinese customers through the use of straw buyers. Martin testified that dealerships often supplied straw buyers to help move inventory they could not otherwise sell.  (Paul Decl., Ex. 4 at 30).  This testimony has been corroborated by correspondence between Martin and dealership personnel that suggests that dealerships were willing to provide information that Martin needed for "customs."  (Martin Decl., Ex. 1-3).  In light of this evidence, a jury could conclude that dealerships were selling custom-order cars or cars lingering on their lots to exporters, for a profit, and lying about the identity of the individuals purchasing the cars (both in the paperwork submitted to manufacturers and during this litigation) so that they would not have to pay charge-backs.  If dealerships were deliberately using straw buyers to fill orders for Efans customers, then there is no reason to believe that this practice was believed to be, or was in fact, harmful to their business.

### b.   Intent to Harm Manufacturers

The Government also suggests that straw buyers — acting on Efans' behalf — made false statements that created a discrepancy between the benefits that the Manufacturers expected to receive from the sale of their cars,

and the benefits that the Manufacturers actually received.  (Gov't Br. 19-20).

To evaluate this argument properly, it is important to bear in mind that the

sale of each car in this case involved a two-step process: (i) the Manufacturer

sold the car to a dealership; and then (ii) the dealership sold the car to a retail

customer.  (*See* Gov't 56.1 ¶¶ 19-20).  Thus, while the Manufacturers

negotiated sales contracts with various dealerships, the Manufacturers never

negotiated sales contracts with retail customers (including straw customers).

Consequently, to the extent the Government is arguing that the Manufacturers

entered sales contracts without a clear understanding of the benefits that

would be received from those contracts, the Government must point to some

false information that was presented to the Manufacturers during its

negotiations with the dealerships.  But the Government has presented no such

evidence.  Instead, the Government suggests that: (i) the Manufacturers knew

that exporters occasionally used straw buyers to purchase their cars; and

(ii) they received a commitment from the dealerships that the dealerships

would try to avoid doing business with these straw buyers.  (*See* Gov't Reply 5

("*[A]t most*, … an individual salesperson or other employee at [each] Dealership

was aware of Efans' fraudulent scheme") (emphasis in original)).  Thus, the

Court cannot conclude that the Manufacturers were fraudulently induced to

enter into any agreement.

Nevertheless, this does not end the Court's inquiry.  It is still possible

that Efans committed fraud against the Manufacturers by causing false

information to be transmitted to the Manufacturers, with the knowledge that the false information would "necessary[il]y" cause the Manufacturers financial harm. *D'Amato*, 39 F.3d at 1257. The Government suggests that Efans' deceptive conduct necessarily caused such harm because: (i) Efans compromised Manufacturers' ability to locate their cars in the event of a safety recall; (ii) Efans cost Manufacturers the opportunity to sell replacement parts and services to the owners of their cars; and (iii) Efans tricked Manufacturers into paying bonuses to dealerships that were not actually entitled to receive those bonuses. (*See* Gov't Br. 4). The third has the most traction, but, as explained below, narrowly fails as a basis for granting the Government's motion.

First, while it is clear that Efans compromised the Manufacturers' ability to locate their cars in the event of a safety recall, it is not clear that Efans thereby exposed the Manufacturers to additional monetary liability. *Cf. Binday*, 804 F.3d at 571 (noting that the Second Circuit has upheld convictions for mail or wire fraud where the "defendants' misrepresentations … exposed the lender or insurer to unexpected economic risk"). The Government has not introduced any cases or evidence suggesting that an auto company could be held liable for an accident caused by faulty manufacturing, if the company used reasonable recall procedures, but the recall notice did not reach a customer solely because the customer deliberately concealed his or her identity. Nor is there any evidence that a concerted effort on the part of a

19

Manufacturer to get such notice out — which effort failed solely because of the deceptive conduct of a third-party exporter that was unknown to the Manufacturer — would be so damaging to that Manufacturer's reputation that the company's bottom line would be harmed.[3]

In addition, Claimants have cast doubt on the Government's assertion that Efans cost Manufacturers the opportunity to sell replacement parts to the owners of their cars.  Shane Martin stated that many of the vehicles that he purchased for Efans customers were either vehicles that were special-ordered on behalf of Chinese customers or vehicles that the dealerships were unable to sell to local customers.  (Martin Decl. ¶ 8).  Consequently, a jury might conclude that Efans was not taking cars out of the hands of U.S. customers who would have bought additional parts and services from the Manufacturers. Nor has the Government excluded the possibility that the ultimate purchasers of these vehicles would have purchased the parts from the Manufacturers in China.

---

[3]     Of course, a manufacturer could decide that it wants to do everything in its power to prevent accidents caused by ineffective recall procedures, regardless of whether any accident would have an effect on its bottom line.  Such a manufacturer might negotiate a very rigid contract with dealerships (i.e., a contract that requires dealerships to take many steps to guard against the use of straw buyers).  *Cf. United States* v. *Binday*, 804 F.3d 558, 570 (2d Cir. 2015) (suggesting that property rights include a right to dictate the terms of a transfer of ownership).  But once that contract has been forged, and the manufacturer has transferred its cars to the dealership — in accordance with the contract — the manufacturer's lingering desire to prevent accidents is not a property interest that is protected by the wire fraud statute.  Thus, even if Efans' deceptive behavior made accidents more likely, that alone is not enough to show that Efans *defrauded* any of the Manufacturers in this case.  Rather, there must be some evidence that Efans' deceptive behavior affected the Manufacturers' financial situation.

The Government's most persuasive claim is that Efans' deceptive conduct was necessarily harmful because it induced Manufacturers to pay bonuses to various dealerships that sold cars to Efans' straw buyers; the Manufacturers would not have paid these bonuses if they knew that the dealerships were really selling to an exporter. (*See* Gov't Br. 4-5; Gov't 56.1 ¶ 29). The Court agrees that tricking a company into paying bonuses to individuals or entities who have not earned them is necessarily harmful conduct. And Efans appears to have been a knowing participant in that harmful conduct. *See United States* v. *Abrams*, 539 F. Supp. 378, 383 (S.D.N.Y. 1982) (suggesting that a participant in a fraud ring can only be convicted if he knew he was engaged in harmful conduct). Both Martin and Kong were aware that dealerships preferred to have local individuals sign as the buyers for Efans' vehicles, even though the cars were ordered on behalf of Chinese customers. (Gov't 56.1 ¶ 77; Cl. 56.1 ¶ 77). According to Claimants, dealership employees told Efans that the local buyers were needed to comply with the "dealership[s'] internal protocol." (Cl. 56.1 ¶ 77). Such an explanation is inherently suspect; any reasonable person who heard that straw buyers were needed to comply with "protocol" would at least wonder whether the dealerships (or dealership employees) were obtaining some sort of (unearned) financial benefit by creating a false impression that particular cars would be driven locally. Consequently, when Efans learned that straw buyers were needed to comply with "protocol," it should have asked the dealerships what the protocol was and why it existed.

21

But the record reflects that instead of taking this simple step, Efans closed its eyes to the possibility that it was helping the dealerships obtain unearned monetary benefits. *See United States* v. *Carlo*, 507 F.3d 799, 802 (2d Cir. 2007) (suggesting that a defendant may be considered a knowing participant in a fraud if the defendant "was aware of a high probability" that he was part of a fraud ring, but "consciously avoided confirming that suspicion").

The Court finds this argument persuasive, and it might have been dispositive, had there not been record evidence that Efans personnel consulted with several attorneys regarding their business practices. (*See generally* Cl. 56.1 ¶¶ 93-95).[4]  At his deposition, Shane Martin recalled speaking with an attorney named Randy Fishman, who told him that it was a "legal practice to purchase cars in the names of third parties." (Paul Decl., Ex. 4 at 105).  He recalled additional communications with an attorney named "Blair or Blaine" who had been referred to him by David Lee at Passport BMW. (*Id.* at 106-10).[5] This second attorney advised Martin that "there is nothing illegal about buying or selling cars for a first party, second party or third party" (*id.* at 108-09), and that it was "legal to export automobiles in the United States" (*id.* at 109).

---

[4]     Claimants also note that Martin conducted some internet research to see if Efans' business model was legal.  (*See, e.g.*, Cl. 56.1 ¶¶ 93, 95).  The Court does not believe that Martin, who had an eleventh-grade education and no legal training, could convince a reasonable jury that his internet research alone was a meaningful indicator of good faith.  (*See* Paul Decl., Ex. 4 at 8).

[5]     In fact, the second attorney's name was Hal Blatt, and at the time the motion was filed, he worked as the Finance Manager at Bob Davidson Ford Lincoln.  (*See* Cl. 56.1 ¶ 94).

22

Martin attests that he then shared the fruits of these communications with others at Efans.  (*Id.* at 115; *see* Cl. 56.1 ¶ 93).

The Government has identified certain admissions in Martin's averments about his communications with counsel, including the facts that (i) Martin's meeting with Fishman was more "friendly" than "legal," and lasted less than 30 minutes; (ii) Martin did not retain Fishman for this advice; and (iii) Fishman has no specialty in this area of the law.  (*See* Gov't 56.1 ¶¶ 93-95).  To these curiosities the Court adds its observation of, for lack of a better term, the selective precision with which Martin answered deposition questions concerning his (and Efans') understandings that their respective conduct was lawful.  That said, it is not the province of the Court to weigh the credibility of a party's witness.  Construing all of this evidence in the light most favorable to Claimants, the Court finds that a reasonable jury could conclude that Efans was taking good faith (if perhaps inadequate) steps to ensure that it was not defrauding the dealerships or the Manufacturers.  *See United States* v. *Certain Funds on Deposit in Scudder Tax Free Inv. Account No. 2505103*, 998 F.2d 129, 131 (2d Cir. 1993) (noting that "questions of intent" are "especially unsuitable for summary judgment").  This evidence forecloses the Government's motion.

## CONCLUSION

In sum, while the Government may well have the better of the legal arguments, Claimants might nonetheless be able to persuade a reasonable jury that Efans acted without fraudulent intent.  As a result, the Government's

23

motion for summary judgment must be DENIED.  The Clerk of Court is directed to terminate the motion at docket entry 77.

The parties are further ORDERED to appear for a conference on **Monday, September 26, 2016, at 3:00 p.m.** in Courtroom 618 of the Thurgood Marshall U.S. Courthouse, at which time the Court will schedule a trial in this matter.

SO ORDERED.

Dated:      August 29, 2016
            New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

24